[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-15037
Non-Argument Calendar

_____

Agency No. A98-862-782

RAZMIK HAKHVERDYAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(June 19, 2008)**

Before TJOFLAT, BLACK and HULL, Circuit Judges.

PER CURIAM:

Razmik Hakhverdyan petitions for review of the Board of Immigration

Appeals' (BIA) decision affirming the Immigration Judge's (IJ) order denying his application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). After review, we deny Hakhverdyan's petition for review.

## I. BACKGROUND

On September 19, 2004, Hakhverdyan, a native of Iran and citizen of Armenia, entered the United States without being admitted or paroled.[1] On July 1, 2005, Hakhverdyan filed an application for asylum, withholding of removal and CAT relief, claiming persecution in Armenia because of his nationality and political opinion. On December 16, 2005, the government issued a notice to appear charging Hakhverdyan with being an alien in the United States having not been admitted or paroled, pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).

**A.    Asylum Application**

According to his application, Hakhverdyan worked in Armenia as an English teacher. In 2003, during the presidential election between then-president Robert Kocharyan and Stephan Demirchyan, Hakhverdyan supported Demirchyan. Prior to the election, the school principal where Hakhverdyan worked confronted him

---

[1]Hakhverdyan used a fraudulent Lithuanian passport to fly to Paris, France and then to Mexico. From Mexico, Hakhverdyan entered the United States by car.

about his voting choice and told him that, as a government employee, he was expected to vote for Kocharyan and would be paid $200 for doing so. After Kocharyan was re-elected, Hakhverdyan was called to the principal's office and fired because he had disobeyed the order to vote for Kocharyan.

Because many considered Kocharyan's re-election to be the result of fraud, Hakhverdyan and others protested to force Kocharyan to resign. During one demonstration on April 12, 2004, police used stun grenades and electric shock equipment against protesters. Police injured, arrested and detained Hakhverdyan for three days. During detention, Hakhverdyan was subjected to physical and mental abuse, called a Moslem dog and foreigner, and his life was threatened. At one point, a guard put a unloaded gun to Hakhverdyan's head and said, "I will kill you here like a dog," and pulled the trigger. On the third day, Hakhverdyan was told that if he signed a paper saying that he was a hooligan and had disrespected the president, he would be released. After release, Hakhverdyan received threatening phone calls. Because he felt his life was in danger, Hakhverdyan fled Armenia.

Attached to Hakhverdyan's application were these documents: (1) a copy of his Armenian passport; (2) an excerpt from his Labor Book, together with an English translation, stating that Hakhverdyan was fired in March 2003; (3) a copy of a false Lithuanian passport; (4) copies of his travel documents to Mexico; (5) a

3

copy of a Human Rights Watch article discussing arrests and police violence against political opposition supporters in Armenia; (6) a statement regarding his residency in Alpharetta, Georgia since January 2005; and (7) excerpts from his Armenian passport showing validity through May 9, 2006.

**B.    Country Reports and Other Documentation**

The record before the IJ included the 2004 and 2005 Country Reports on Human Rights Practices for Armenia.  The 2004 Country Report indicated (1) that in March and April 2004, Armenian authorities had denied the opposition parties requests for permits to hold rallies and demonstrations, and (2) nonetheless, small rallies took place without government interference.  The Report noted that, between April 13 and April 15, 2004, the police had detained and questioned persons involved in April 12 and 13, 2004 protest rallies and used flash grenades, water cannons and batons to disperse hundreds of protestors who blocked a major city street for more than eight hours.  In June 2003, a new law took effect that lifted the requirement of obtaining a government permit to organize rallies or demonstrations, although there are still limitations to location.  According to the Report, in the area of political rights, there were reports of harassment to opposition supporters, but no reports of punitive job dismissals.

The 2005 Country Report indicated (1) there were no reports of politically motivated arrests resulting in continued detention at year's end, (2) there were no

4

reports of political prisoners, and (3) although the law provided that the government could interfere with illegal rallies and demonstrations, again, it did not interfere with small rallies that took place without permission.

The record also contained an Amnesty International 2005 Report on Armenia, which stated that, on April 13, 2004, police used water cannons and stun grenades on protestors calling for Kocharyan's resignation. According to the Report, most of the activists were detained for up to 48 hours and were beaten and ill-treated at the police station. The report noted that Edgar Arakelian, an opposition activist at the April 13, 2004 demonstration, was arrested and admitted hitting a police officer with an empty plastic bottle, although Arakelian claimed he acted in self-defense after the officer hit him and broke his front teeth. Arakelian was sentenced to 18 months' imprisonment in May 2004 and served a third of his sentence before being released.

Hakhverdyan submitted several articles discussing police interference with the opposition demonstrations on or around April 12, 2004. One article, dated April 12, 2004, stated that opposition supporters were stopped from approaching Kocharyan's residence by police wearing riot gear who were ready to use water cannons, tear gas and stun grenades and that the demonstrators and the police were in a standoff. Another article, dated April 13, 2004, stated that police had broken up the demonstration overnight by charging the participants with truncheons, water

5

cannons and stun grenades and that opposition leaders and activists had been rounded up in raids and arrested. Approximately thirty people were treated for injuries resulting from clashes with the police, although some people were avoiding seeking treatment for fear of police reprisals.

## C.    IJ Hearing

At the hearing, Hakhverdyan testified that, although he attended demonstrations supporting Demirchyan, he was not a member of any political party. Hakhverdyan was told that if he voted for Kocharyan that he would get a raise in his teacher salary. Hakhverdyan voted for Demirchyan. Because the vote in the first election was very close, a second election was held. When the school found out that Hakhverdyan had voted for Demirchyan in the first election, it cut his teaching hours. After the second election, the school's director told Hakhverdyan that he was fired because "we are satisfying the way of your teaching and the student they don't like you." Hakhverdyan was told he was being fired because "you didn't come to your senses" which he took as a comment about his voting. Hakhverdyan said that two other teachers who voted for Demirchyan were fired.

At the April 12 demonstration attended by Hakhverdyan, the demonstrators walked toward the president's house at midnight, shaking police cars as they went. At some point, all the lights in the street were turned off, and cars with water

cannons came and squirted the demonstrators with water. The military arrived and caused an explosion that Hakhverdyan described as a bright light accompanied by a loud noise that caused people not to be able to hear. The explosion shot small bits of plastic around that injured people. Hakhverdyan stated that he was hit by the plastic pieces, and, although he was not severely injured, the plastic burned. Hakhverdyan attempted to come to the aid of another and was beaten on his back and legs with a baton, tied up and taken to the police station.

Upon arrival, police searched Hakhverdyan, took his money and cell phone and questioned him about his political affiliation. The police told Hakhverdyan that he was being arrested because he was part of an illegal demonstration, and thus a hooligan, and told him to sign a document which said as much. Hakhverdyan refused. Hakhverdyan was detained in a very dark, wet room with metal bunk beds and no mattresses. During the course of his detention, he was kicked by several police officers, and questioned repeatedly. When Hakhverdyan told the police that it was a calm demonstration and that some of the participants were dancing and singing, an officer put a gun to Hakhverdyan's head and told him "now dance and sing." Although Hakhverdyan was given food, the police beat him and did not let him use the bathroom. Prior to releasing Hakhverdyan, police accused him of hitting a police officer with a bottle, and, when he was being handcuffed, pulling the police officer's shirt. Further, the police implied that they

were going to harm Hakhverdyan because he had touched a police officer's uniform. When Hakhverdyan asked about his money and cell phone, he was told that maybe he was drunk and did not remember what happened to them.

After being released, Hakhverdyan, with the help of his brother and friends, was able to get a fake Lithuanian passport and travel to Paris. From Paris, Hakhverdyan flew to Mexico, where he stayed for about ten days before entering the United States. Hakhverdyan believed he would be arrested if deported to Armenia because he had fled the country illegally.

During cross-examination, Hakhverdyan explained that his Armenian and Lithuanian passports, although issued ten years apart, contain the same picture because he had extra photos. The government then asked Hakhverdyan, in light of the fact that he was carrying around passport photos and several pages were missing from the Armenian passport, why one should believe that his Armenian passport was authentic. Hakhverdyan explained that he cut out several pages after his nephew had drawn on them.

**D.  Decisions of the IJ and the BIA**

The IJ denied Hakhverdyan's asylum application. The IJ found that Hakhverdyan lacked credibility after considering his "demeanor, candor, responsiveness, and the rationality and internal consistency and inherent persuasiveness of his testimony." Specifically, the IJ found it troubling that

8

Hakhverdyan was unable to answer simple "yes or no" questions and that his hearing testimony with regard to the April 12 demonstration and his arrest was considerably more detailed than the statement attached to his asylum application or his statements to the Asylum Office in his credible fear interview. The IJ stated that he had reviewed all of Hakhverdyan's supplemental documentation and noted the following inconsistencies: (1) in Hakhverdyan's application statement, Hakhverdyan did not provide details about his injuries or harm that occurred to him during the police interference with the April 12 demonstration; (2) in that statement, Hakhverdyan said that the police used stun grenades and electric shock equipment; however, at the hearing, he testified that the police used water cannons and an explosive device that shot small pieces of plastic; (3) although Hakhverdyan testified that an officer held a gun to his head, he did not indicate that the trigger was pulled, as he had in his application statement; (4) although Hakhverdyan stated in his application statement that he received threatening phone calls after he was released, he failed to mention such calls in his hearing testimony; (5) Hakhverdyan testified at the hearing that police had taken his money and cell phone, but failed to note this in his application statement; and (6) Hakhverdyan stated for the first time at the hearing that he was accused of hitting a police officer with a bottle. As to this last inconsistency, the IJ noted that the 2005 Amnesty International report contained a similar account of an arrested demonstrator who admitted hitting a

police officer with a plastic bottle.

The IJ noted that Hakhverdyan presented no corroborating letters or statements from others who helped him. The IJ also found that Hakhverdyan had not established his identity and noted Hakhverdyan's two passports with the same picture.

Alternatively, the IJ concluded that, even if he accepted Hakhverdyan's testimony as true, Hakhverdyan had not established past persecution. Specifically, the IJ determined that Hakhverdyan's termination from his job and treatment by the police for participating in an illegal demonstration did not rise to the level of persecution. The IJ also concluded that Hakhverdyan had not shown a well-founded fear of future persecution. Finally, the IJ determined that, even if Hakhverdyan had established eligibility for asylum, he would deny asylum in the exercise of discretion because of Hakhverdyan's use of fraudulent passports.

Hakhverdyan appealed to the BIA. The BIA affirmed and adopted the IJ's decision. As to Hakhverdyan's credibility, the BIA agreed that the missing pages from Hakhverdyan's passport were "sufficient to call into question his identity." The BIA agreed that the evidence was insufficient to show that Hakhverdyan had suffered past persecution. The BIA stated that Hakhverdyan's alleged mistreatment "was not so severe as to constitute persecution" and that Hakhverdyan had not shown that the mistreatment was on account of a protected

ground.

Hakhverdyan filed this petition for review.[2]

## II. DISCUSSION

On appeal, Hakhverdyan argues that the IJ erred in finding that he was not credible.[3] An applicant for asylum has the burden to show, with specific and credible evidence, either past persecution or a well-founded fear of future persecution on account of a protected ground. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284, 1287 (11th Cir. 2001); 8 U.S.C. § 1158(b)(1)(B)(i)-(ii). In determining whether the applicant has sustained his or her burden, the IJ may weigh the credibility of the applicant's testimony along with other evidence in the record. 8 U.S.C. § 1158(b)(1)(B)(ii). Hakhverdyan's application was filed on July 1, 2005, and thus is governed by the REAL ID Act's new law regarding

---

[2]Because the BIA's decision adopted the IJ's decision, we review the orders of both the BIA and the IJ. Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review factual determinations regarding whether an applicant is eligible for asylum or withholding of removal under the substantial evidence test. Id. at 1283-84. Under the substantial evidence test, "we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). A credibility determination, like any other fact finding, may not be overturned unless the record compels it. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005).

[3]Hakhverdyan's appeal brief identifies as an issue whether the BIA erred in adopting and affirming the IJ's decision. However, the brief fails to offer any argument on this issue. Accordingly, Hakhverdyan has abandoned the issue on appeal. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir.1989) (deeming issue waived where party failed to include substantive argument and only made passing reference to the issue in appeal brief).

credibility determinations.[4]  Section 1158(b)(1)(B)(iii) states:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.  There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal.

8 U.S.C. § 1158(b)(1)(B)(iii).  Thus, the IJ may make an adverse credibility determination based on the "totality of the circumstances" and deny an asylum claim based on inconsistencies, inaccuracies and falsehoods contained in the evidence without regard to whether they go to the heart of the claim.  Id.

"An IJ's denial of asylum relief . . . can be supported solely by an adverse credibility determination, especially if the alien fails to produce corroborating evidence."  Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006).

---

[4]In 2005, the REAL ID Act of 2005 amended 8 U.S.C. § 1158, changing the law regarding credibility determinations.  See Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 231, 303 (2005).  The amendment to § 1158(b) took effect on May 11, 2005, the date of enactment, and apply to applications of asylum and withholding of removal filed after that date.  See id. § 101(h)(2), 119 Stat. at 305.

However, the IJ must consider all the evidence submitted by the applicant, including any documentation. Forgue, 401 F.3d at 1287. The IJ must make an explicit credibility finding and offer "specific, cogent reasons for the finding." Chen, 463 F.3d at 1231. If the IJ makes an explicit credibility finding, the applicant bears the burden to show that the finding is not supported by specific, cogent reasons or by substantial evidence. Id. When the IJ identifies an applicant's inconsistencies that are supported by the record, we "will not substitute our judgment for that of the IJ with respect to its credibility findings." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 819 (11th Cir. 2004).

Here, the IJ made an explicit adverse credibility finding and provided specific, cogent reasons for finding Hakhverdyan not credible that are supported by substantial evidence. Specifically, the IJ emphasized the lack of detail in Hakhverdyan's application and statement to the Asylum Office in contrast to the vivid detail at the hearing, the absence of corroborating documentation and Hakhverdyan's failure to establish his identity. The IJ also identified a number of inconsistencies between Hakhverdyan's application statement, his statement to the Asylum Office and his testimony at the hearing. Contrary to Hakhverdyan's argument, the IJ was entitled to rely on inconsistencies in the record that did not go to the "heart" of his claim. 8 U.S.C. § 1158(b)(1)(B)(iii). Additionally, the IJ was permitted to, and did, base the credibility determination on Hakhverdyan's

13

demeanor, candor and responsiveness and the inherent plausibility of Hakhverdyan's account.  See id.  Accordingly, the IJ did not err in basing his credibility finding on the inconsistencies identified in the order and was not required to accept Hakhverdyan's explanations for them.  After review, we cannot say that the record compels reversal of the IJ's credibility determination.

We also cannot say that the IJ erred in finding that Hakhverdyan failed to establish his identity.  Hakhverdyan traveled across Europe and into the United States on a fraudulent Lithuanian passport and produced an Armenian passport that had pages removed.  Further, although the two passports were issued years apart, they both contained the exact same picture of Hakhverdyan.  Thus, there were problems with both passports.

Finally, Hakhverdyan produced little evidence corroborating the key aspects of his persecution claim.  See Yang v. U.S. Atty. Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) ("The weaker an applicant's testimony, . . . the greater the need for corroborative evidence.").  The record contains articles and country reports indicating that there was a confrontation between police and demonstrators opposing Kocharyan's election on April 12 and 13, 2004, and that some of the demonstrators were detained for a time and mistreated while in custody.  However, Hakhverdyan presented no evidence corroborating his claim that he was one of those demonstrators or that he was detained and mistreated by police.  Thus,

14

Hakhverdyan's documentation is insufficient to compel a conclusion that Hakhverdyan is credible or that he suffered past persecution or has a well-founded fear of future persecution.

Accordingly, substantial evidence supports the determination of the IJ and the BIA that Hakhverdyan failed to carry his burden to prove his refugee status for asylum purposes.[5]  Because Hakhverdyan failed to carry his burden as to asylum, he has likewise failed to meet the higher burden of proof for the withholding of removal and CAT relief.  See Al Najjar, 257 F.3d at 1292-93, 1303-04.

**PETITION DENIED.**

---

[5]We do not address the alternative findings that, even if Hakhverdyan's allegations were true, Hakhverdyan failed to show that the allegations rise to the level of past persecution or that he has a well-founded fear of future persecution on account of his political opinion or national origin.

15